UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
NATASHA MILES,

                                        Plaintiff,

              -against-

                                                          **COMPLAINT**

THE CITY OF NEW YORK,
PHILIP VACCARINO,
and MATHEW REICH,

                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Plaintiff, Natasha Miles, by her attorneys, Lumer & Neville, hereby alleges upon information and belief as follows:

### PARTIES, VENUE, and JURISDICTION

      1.      At all times hereinafter mentioned, plaintiff Natasha Miles was an adult female resident of Richmond County, in the State of New York.

      2.      At all relevant times hereinafter mentioned, defendant City of New York ("New York City"), was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including but not limited to, the New York City Police Department ("NYPD") and its employees.

      3.      At all relevant times hereinafter mentioned, defendant Philip Vaccarino (Tax No. 943905) was employed by New York City as a member of the NYPD. Vaccarino is sued in his individual capacity.

4.    At all relevant times hereinafter mentioned, defendant Mathew Reich was employed by New York City as a member of the NYPD. Reich is sued herein in his individual capacity.

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1983.

6.    Venue is properly laid, pursuant to 28 U.S.C. Section 1391, et seq., in the Eastern District of New York, where plaintiff and defendant City of New York reside, and where the majority of the actions complained of herein occurred.

## RELEVANT FACTS

7.    During the afternoon hours of January 2, 2016, plaintiff was lawfully driving on Maple Parkway in Staten Island, New York.

8.    Plaintiff was pulled over by the two individual defendants, both of whom were on duty and utilizing an NYPD vehicle.

9.    Plaintiff had not committed any traffic violations nor was she engaging in any unlawful conduct, or any conduct that could reasonably be viewed as unlawful or otherwise justify the individual defendants' decision to initiate a stop of her vehicle.

10.    During the course of the stop, the defendant officers opened the door to her vehicle and forcibly seized and handcuffed plaintiff.

11.    There was no lawful basis for the vehicle stop, no lawful basis for defendants to open plaintiff's car door, and no legal basis for the defendants to employ any level of force against plaintiff whatsoever, much less the amount of force actually employed.

12.     Plaintiff had complied with all directions and instructions given by the individual defendants and their use of force was objectively unreasonable and unnecessary, regardless of whether the stop itself was lawful or justified.

13.     The defendants proceeded to arrest plaintiff by forcibly pulling her from the car, violently twisting her arms, and other, similar violent conduct, before, while, and after placing her in handcuffs.

14.     These actions caused plaintiff serious physical injuries, including, but not limited to, a fracture of her right wrist, a partial tear of her biceps tendon, as well as a herniated disc which was caused or exacerbated by defendants' conduct.

15.     The defendants then searched plaintiff's car, which did not yield any drugs, weapons, or any other type of contraband.

16.     Defendants claimed that they observed an empty bottle of alcohol in plaintiff's car and issued her criminal summons 4421254761, which charged her with violation of New York's Open Container Law under NY VTL § 1227(1), which was signed by defendant Vaccarino.

17.     No such bottle was observed in the cabin of plaintiff's vehicle and plaintiff was not in violation of any statute, rule, regulation, or other promulgated code that would permit plaintiff's arrest.

18.     The defendants, who  knew and understood that plaintiff was not guilty of any crime or offense, issued her the criminal summons in order to cover up and justify their initial unlawful stop of plaintiff, and their subsequent use of physical force against her.

19.     The criminal summons, replete with false, inaccurate, or misleading information, was forwarded to court and Richmond County District Attorney ("RCDA") personnel for the purpose of continuing plaintiff's criminal prosecution for an offense defendants knew and understood plaintiff had not committed.

20.     On March 23, 2016, the Criminal Court of the City of New York, Richmond County, dismissed the summons and the matter was terminated in plaintiff's favor.

21.     To the extent that either Reich or Vaccarino did not directly engage or participate in the above-mentioned misconduct, that defendant was fully aware that plaintiff was being wrongly stopped, wrongly subjected physical force that was objectively unreasonable, and that a criminal summons was being wrongly issued to plaintiff, and said defendant failed to take any steps to intervene in such conduct to prevent or limit the harms being inflicted, both on that day and every day thereafter, and thus is as liable for said conduct as his fellow defendant.

23.     At all times relevant herein, the individual defendants were acting within the scope of their employment, and their acts were done in furtherance of the City of New York's interests and without legal justification or excuse.

## FIRST CAUSE OF ACTION

(42 USC § 1983 Claims for False Arrest, Excessive Force,
Malicious Prosecution, and Denial of Fair Trial as for the Individual Defendants)

25.     Plaintiff repeats the above-stated allegations as though stated fully

herein.

26.     The individual defendants willfully and intentionally seized, arrested, and detained plaintiff without probable cause, or any reasonable basis to believe probable cause existed, or otherwise failed to intervene while witnessing their fellow officers engaged in this unconstitutional conduct.

27.     The individual defendants willfully and intentionally subjected plaintiff to physical force in excess of what was objectively reasonable under the circumstances, causing plaintiff to suffer various physical injuries.

28.     Defendants did so with no reasonable basis to believe that such physical force was objectively reasonable or necessary.

29.     The individual defendants fabricated evidence, and misled prosecutors in order to manufacture probable cause for the plaintiff's arrest and subsequent prosecution, or otherwise failed to intercede with the RCDA on behalf of plaintiff.

30.     By so doing, the individual defendants, individually and collectively, subjected plaintiff to (i) false arrest and imprisonment, (ii) excessive force, (iii) denial of due process and the right to a fair trial through the fabrication of evidence, and (iv) malicious prosecution, thereby violating or aiding and abetting in the violation of, plaintiff's rights under the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.

31.     To the extent that either of the individual defendants did not directly engage in this unconstitutional conduct, such defendant was aware of such conduct by his fellow officer, and yet consciously failed to make any effort, despite ample time and

opportunity to do so, to intervene or otherwise put a stop to the aforementioned misconduct and violation of plaintiff's constitutional rights, by remaining silent or otherwise deliberately choosing not to take any meaningful steps to correct his fellow officer's misconduct, and is thus as liable for said conduct as the actor whose conduct the defendant permitted to continue without intervention.

32.    By reason thereof, the individual defendants have violated 42 U.S.C. § 1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, imprisonment and the deprivation of liberty, lost earnings, and the loss of her constitutional rights.

## SECOND CAUSE OF ACTION

(Monell Claim Against the Municipal Defendant)

33.    Plaintiff repeats the preceding allegations as though stated fully herein.

34.    The individual defendants' false arrest and prosecution of plaintiff, the use of excessive force, the fabrication of evidence against plaintiff to justify their unconstitutional conduct, and/or their failure to intervene or otherwise act to prevent or mitigate the harms being inflicted by their fellow officers, were carried out in accordance with an existing plan or policy created or otherwise condoned by the municipal defendant and designed to increase the number of arrests made without regard to probable cause.

35.    The purpose of this policy or plan was to generate large numbers of arrests to help the NYPD create a false impression of positive activity by their officers and to satisfy internal quotas.

36.    In addition, members of the NYPD are evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, search warrants secured, and other, similar criteria. Thus, members of the NYPD routinely make arrests and engage in other police activity without sufficient legal cause in order to raise their levels of "activity" and improve the perception of their job performance.

37.    The NYPD tracks the number of arrests made by each officer, but in evaluating its officers, does not take into account the outcome of these arrests, even though this information is available to the NYPD. As a result, officers are well aware that (a) they are being evaluated based on, in large part, the number of arrests made, and (b) their supervisors do not care whether these arrests lead to actual criminal prosecutions, much less convictions.

38.    More precisely, under this policy or plan, officers are encouraged or pressured to make as many arrests as possible, which has caused and will continue to cause, its officers, including the individual defendants and their colleagues, to make arrests without probable cause and without any factual basis for criminal charges.

39.    Upon information, this policy was in existence as of January 2, 2016, as codified in an October 17, 2011 Police Officer Performance Objectives Operation Order, in which NYPD Commissioner Kelly directed all commands that, "Department managers can and must set performance goals" relating to the "issuance of summons, the stopping and questioning of suspicious individuals, and the arrests of criminals."

40.    Upon information and belief, that same Operation Order stated, "uniformed members. . . .Who do not demonstrate activities . . . or who fail to engage in

proactive activities . . . will be evaluated accordingly and their assignments re-assessed."

41.     In the case of Floyd v City of New York, 813 F. Supp. 2d 417, 448 (S.D.N.Y.) on reconsideration, 813 F. Supp. 2d 457 (S.D.N.Y. 2011), United States District Judge Shira A. Scheindlin denied the City of New York's motion for summary judgment, in part, based on evidence that the NYPD had a widespread practice of imposing illegal stop and frisk, summons, and arrest quotas on officers. The evidence cited in Floyd included testimony from various officers, audio recordings of roll call meetings in which precinct commanders issued orders to produce certain numbers of arrests, stops and frisks, and summonses, in addition to a labor grievance on behalf of six officers and one sergeant who were transferred out of their department for allegedly failing to meet a ten-summons-per-month quota. In January 2006, a labor arbitrator found that the NYPD had imposed summons quotas on its officers in violation of New York State labor laws.

42.     In another Southern District of New York case, Schoolcraft v. City of New York, 10 CV 6005 (RWS), the plaintiff, a police officer assigned to Brooklyn's 81 precinct alleged that precinct commanders and supervisory personnel expressly imposed arrest and summons quotas, and explicitly directed officers to "arrest and summons fully innocent people" and then come up with a justification later.

43.     In 2012, Police Officer Craig Matthews commenced Matthews v. City of New York, 12 CV 1354 (BSJ) in the Southern District of New York, alleging that his complaints that the existing quota system was leading to unjustified stops and arrests, and thereby causing damage to the Department's relationship with the local community, led to his

termination. There was little dispute that he made these complaints or that they were well founded. See Matthews v. City of New York, 779 F.3d 167, 169 (2d Cir. 2015).

44.    That this plan is still in effect is reflected in a class action suit apparently filed in August 2015 by various police officers alleging that the NYPD still requires officers to meet fixed numerical goals for arrests and court summonses each month, according to a New York Times article published February 18, 2016, which can be found online at http://nyti.ms/1R9FCGu.

45.    The policy or plan was kept in effect through the date of plaintiff's arrest, despite the municipal defendant's knowledge that county prosecutors were often not charging the individuals arrested, or otherwise not actively pursuing their prosecution, or that there was insufficient evidence to justify the arrests and illegal searches, or that the arresting officers were seeking to bolster the arrests with false allegations, and that the prosecutors often had found insufficient cause to justify the imposition of charges or continued prosecution if charges were filed.

46.    According to an article in New York Magazine, dated October 10, 2014, the City of New York issued a report reflecting that it paid an average of $33,875 per case to resolve well over 10,000 cases between 2009 and 2014, and that figure did not take into account filed cases that were still pending when the report was compiled. Similarly, the City Comptroller has reported that the City of New York's payments to resolve allegations of misconduct by members of the NYPD had risen from $99 million to $217 million in between 2005 and 2014, as stated on Page 2 in the Comptroller's August 2015 report at

http://nylawyer.nylj.com/adgifs/decisions15/083115claims.pdf. While such numbers relate to the NYPD as a whole, they reflect that the City had actual knowledge that its police department was routinely engaging in unconstitutional and unlawful conduct, at least some of which can be attributed to a quota policy that stressed the need for a specific quantity of arrests, without regard for quality, meaning evidence supporting probable cause for the arrests.

47.     In October 2011, following a bench trial in New York State Supreme Court, Kings County, under indictment number 06314-2008, former NYPD narcotics officer Jason Arbeeny was convicted of planting drugs on two individuals and falsifying arrest reports. Before issuing a verdict of guilty, the trial judge scolded the NYPD for what he described as a "widespread culture of corruption endemic in its drug units." The judge further stated that the testimony demonstrated that the NYPD narcotics divisions maintain a "cowboy culture" and that he was "shocked, not only by the seeming pervasive scope of misconduct but even more distressingly by the seeming casualness by which such conduct is employed."

48.     In an Order dated November 25, 2009, in Colon v. City of New York, 09- CV-0008 (E.D.N.Y.), the Hon. Jack B. Weinstein stated:

> Informal inquiry by the court and among the judges of this
> court, as well as knowledge of cases in other federal and state
> courts, has revealed anecdotal evidence of repeated, widespread
> falsification by arresting police officers of the New York City
> Police Department. Despite numerous inquiries by commissions
> and strong reported efforts by the present administration --
> through selection of candidates for the police force stressing
> academic and other qualifications, serious training to avoid

> constitutional violations, and strong disciplinary action within
> the department -- there is some evidence of an attitude among
> officers that is sufficiently widespread to constitute a custom or
> policy by the city approving illegal conduct of the kind now
> charged.

49.    It is thus manifestly clear through the litigation brought in the Eastern

and Southern Districts of New York, as well as the many cases filed in New York State

courts, that thousands of civilians have alleged that members of the NYPD have deliberately

arrested them without probable cause. Thus, even if the municipal defendant was not the

architect of the policies and routinized conduct causing these unlawful arrests, the City was

certainly on notice of the practice, and by failing to take any meaningful corrective steps, has

ratified, endorsed, or otherwise communicated its acceptance of this policy to the officers it

continues to employ.

50.    Rather than take meaningful steps to reduce and eliminate such

misconduct by its officers, the City of New York and the NYPD have instead affirmatively

announced a renewed commitment to defending such misconduct. In an article in the New

York Times on February 4, 2016, the link to which is http://nyti.ms/1nPv0mO, the City

proudly announced that the NYPD had "created a new 40-member legal unit that develops

evidence that the Law Department can use to defend lawsuits against the police, and the

[Law Department] hired about 30 lawyers to bolster its litigation teams and to try more cases

in court." According to this article, these steps were warmly received by police union leaders.

51.    The City's stated response to the wave of litigation caused by

misconduct on the part of the NYPD is thus directed not at the deliberate and frequent

constitutional violations underlying the consequential litigation, but rather at defending such misconduct so that officers can continue to engage in unconstitutional conduct without fear of being sued or held accountable. In so doing, the City has dispensed altogether with any pretense that such misconduct is not sanctioned, ratified, or otherwise endorsed by the City of New York and the NYPD's executive leaders and supervisory personnel.

52.     It is therefore clear that the municipal defendant has not only tolerated, but actively fostered a lawless atmosphere within the NYPD and that the City of New York, at a bare minimum, has been on notice yet was deliberately indifferent to the risk that the undue emphasis on arrest quotas, or minimum activity levels, particularly when coupled with a deliberately indifferent level of supervision, would lead to the violation of individuals' constitutional rights in general, and cause the violation of plaintiff's rights in particular.

53.     By reason thereof, the municipal defendant has violated 42 U.S.C. §1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, lost earnings, as well as the loss of her constitutional rights.

**[Remainder of Page Intentionally Left Blank]**

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

WHEREFORE, plaintiff demands judgment against defendants jointly and severally as follows:

i.     Actual and punitive damages against each of the individual defendants in an amount to be determined at trial;

ii.    Actual damages against the municipal defendant in an amount to be determined at trial;

iii.   Statutory attorney's fees pursuant to, inter alia, 42 U.S.C. §1988 and New York common law, disbursements, and costs of the action; and

iv.    Such other relief as the Court deems just and proper.

Dated:  New York, New York
        October 23, 2016

LUMER & NEVILLE
Attorneys for Plaintiff
225 Broadway, Suite 2700
New York, New York 10007
(212) 566-5060

By: _____
     Michael Lumer (ML-1947)